Commonwealth, Human Relations Commission, Appellant, *v.* Loyal Order of Moose, Lodge No. 107.

452

Argued May 23, 1972. Before JONES, C. J., EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

reargument refused September 13, 1972.

*Roy Yaffe*, Assistant Attorney General, with him *Stanton W. Kratzok*, Assistant Attorney General, for Commonwealth, Human Relations Commission, appellant.

*Thomas D. Caldwell, Jr.*, with him *Caldwell, Clouser & Kearns*, for appellee.

OPINION BY MR. JUSTICE O'BRIEN, July 31, 1972:

On December 29, 1968, K. Leroy Irvis, a Negro, was brought into the Loyal Order of Moose, Lodge No. 107, appellee, as the guest of a member in good standing of the appellee lodge. Three other guests of the involved member were also present, but Mr. Irvis was the only non-Caucasian member of the party. Appellee's personel refused to serve the party in either its dining room or its bar, and there is no dispute that that refusal was based solely on the fact that one of the members of the party was a Negro. Irvis complained to the Pennsylvania Human Relations Commission, which, on January 13, 1969, instituted a complaint against the appellee lodge, alleging violations of the Public Accommodations Provisions of the Act of October 27, 1955, P. L. 744, as amended by the act of February 28, 1961, P. L. 47, 43 P.S. §951, et seq., known as the Pennsylvania Human Relations Act. The lodge filed an answer to the complaint, in which it admitted the essential facts, but denied that it maintained a place of public accommodation and therefore claimed that the commission lacked jurisdiction and authority to deal with the refusal of service incident. In accordance with the provisions of the Human Relations Act, the commission conducted an investigation and found probable cause to proceed. Efforts to adjust the matter by conference, conciliation and persuasion were unsuccessful, and the commission then held a public hearing before hearing examiners. The parties entered into an agreed statement of facts which was adopted by the hearing examiners as their findings of fact, the pertinent portions of which are as follows:

"2. The respondent, Loyal Order of Moose, Lodge No. 107, is a private, non-profit Pennsylvania corporation of the first class, operating a club for the entertainment of its members at premises 225 State Street, Harrisburg, Dauphin County, Pennsylvania.

"3. The respondent is one of many lodges throughout the United States affiliated with Loyal Order of Moose, and operates pursuant to the Constitution and General Laws of the Loyal Order of Moose, . . .

"4. In conjunction with the operation of its club, the respondent operates a dining room and a bar for the sale of liquor or malt and brewed beverages upon its said premises.

"5. The said bar is operated by respondent pursuant to a Catering Club License No. CC-109 issued by the Liquor Control Board of the Commonwealth of Pennsylvania.[1]

"6. From time to time the respondent caters meals or banquets upon its said premises for the benefit of organizations other than Loyal Order of Moose and individuals other than members of Loyal Order of Moose, at which times respondent makes its premises available to such organizations and individuals without discrimination because of race or color.

"7. The respondent maintains a practice and policy of accepting members of the Caucasian race only.

"8. The respondent permits a member of any lodge of Loyal Order of Moose to bring Caucasian guests upon the premises operated by it, particularly in its

---

[1] Irvis also commenced an action in the United States District Court for the Middle District of Pennsylvania. In that action he alleged that the granting of a liquor license to the lodge constituted state action and that the state was thereby participating in the the discriminatory practices of the lodge, in violation of the Fourteenth Amendment to the Constitution of the United States. A three-judge panel agreed. *Irvis v. Scott*, 318 F. Supp. 1246 (M.D. Pa. 1970). On appeal, the United States Supreme Court reversed, holding that the state action involved was not such as constituted a violation of the Equal Protection Clause of the Fourteenth Amendment. *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 92 S. Ct. 1965 (1972). The question of the propriety of the grant of a liquor license to the lodge is not before us, and we neither consider nor decide that issue.

dining room and at its bar, but maintains a practice and policy of refusing to permit any such member to bring non-Caucasian guests therein.[2]

"9. On Sunday, December 29, 1968, at approximately 6:15 o'clock p.m., Harry A. Englehart, Jr., Caucasian and a member in good standing of Loyal Order of Moose, brought the following four guests upon the premises operated by respondent: K. Leroy Irvis, Negro; Herbert Fineman, Caucasian; James F. Prendergast, Caucasian, and Vincent Scarcelli, Caucasian.

"10. At the said time and place, the respondent refused to serve the said party of five men either in its dining room or at its bar.

"11. Such refusal of service was because K. Leroy Irvis, one of the members of the party, is a Negro."

Based upon the agreed statement of facts and the arguments of counsel, the hearing examiners filed an opinion in which they found the lodge to be in violation of the Human Relations Act and recommended remedial action to the commission. The commission accepted the recommendation of the hearing examiners and entered an order as follows:

"1. That the respondent, Loyal Order of Moose, Lodge No. 107, its officers, agents and employes, shall cease and desist from directly or indirectly refusing, withholding from or denying to Negro guests of club members or to other persons who are guests of club members, because of their race, color, religious creed,

---

[2] At the time that this litigation commenced, the national Moose organization did not prohibit its members from bringing non-Caucasian guests into the Moose facilities, even though the Harrisburg lodge did indeed maintain such a prohibition. Since that time, however, the general laws of the Loyal Order of Moose have been amended by the national body to prohibit the bringing of anyone into a Moose facility as a guest who would not be eligible for membership in the lodge. See Footnote 6 of Mr. Justice REHNQUIST's opinion for the United States Supreme Court majority in *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 92 S. Ct. 1965 (1972).

ancestry or national origin, the accommodations, advantages, facilities or privileges of the dining room and bar operated, owned or controlled by the respondent in the City of Harrisburg or elsewhere in the Commonwealth of Pennsylvania, so long as the respondent maintains a policy or practice permitting members to bring their guests to the said dining room or bar.

"2. That the respondent, Loyal Order of Moose, Lodge No. 107, its officers, agents and employees, shall cease and desist from refusing, withholding from or denying to Negroes or to other persons because of their race, color, religious creed, ancestry or national origin, the full enjoyment of any function, facility or accommodations owned, operated or controlled by the respondent in the City of Harrisburg or elsewhere in the Commonwealth of Pennsylvania, which is open to non-members or to any portion of the general public or in which the respondent accepts or solicits the patronage of non-members or of any portion of the general public.

"3. That the respondent, Loyal Order of Moose, Lodge No. 107, shall take the following affirmative action which in the judgment of the Commission will effectuate the purposes of the Pennsylvania Human Relations Act:

"a. Instruct all members of its House Committee, its officers, managers and employees, in writing, to comply with the requirements of paragraphs 1 and 2 of this Final Order. Copies of such written instructions, signed by all of the respondent's officers, managers, employes and House Committee members and acknowledging receipt and understanding thereof shall be transmitted to the Commission by the respondent; and

"b. Notify all members belonging to the respondent Lodge, in writing, that henceforth the policy and practice of the respondent will be to serve any guest of a member regardless of his race, religion or national origin, so long as the respondent permits members to bring

guests upon its premises. A copy of such written communication shall likewise be transmitted to the Commission by the respondent."

The lodge appealed the order of the commission to the Court of Common Pleas of Dauphin County, sitting as Commonwealth Court. That court reversed the order of the commission, and the commission appealed to the Superior Court. A divided Superior Court affirmed the order of the Court of Common Pleas of Dauphin County,[3] and we allowed an appeal.

The essential question which must be determined in this matter is whether the appellee lodge, specifically its dining room and bar, is a place of public accommodation as to guests and, therefore, subject to the anti-discrimination provisions of the Human Relations Act. The commission, of course, so found, but the Court of Common Pleas of Dauphin County rejected that finding, and its conclusion on that key issue was affirmed by the Superior Court.[4]

We are in agreement with the commission and the Superior Court dissenters.

Section 5 of the Human Relations Act reads in part as follows:

"It shall be an unlawful discriminatory practice, . . . in the case of a fraternal corporation or association,

---

[3] A four-member majority of the Superior Court affirmed the order of the Court of Common Pleas of Dauphin County on the opinion of the Court of Common Pleas of Dauphin County. Judge SPAULDING filed a dissenting opinion in which Judges HOFFMAN and CERCONE joined. *Com. Human Rel. Comm. v. L.O.O.M.*, 220 Pa. Superior Ct. 356, 286 A. 2d 374 (1971).

[4] Mr. Justice REHNQUIST'S opinion for the majority of the United States Supreme Court indicates in Footnote 2 thereof that the courts of Pennsylvania have found the lodge not to be a place of public accommodation. This statement was based on the opinions of the Court of Common Pleas of Dauphin County and the Superior Court, and made no reference to pendency of the instant appeal. Our decision renders this statement inaccurate.

unless based upon membership in such association, or corporation . . .

"(i) for any person being the owner, lessee, proprietor, manager . . . of any place of public accommodation . . . to

"(1) refuse, withhold from, or deny to any person because of his race, color . . . either directly or indirectly, any of the accommodations, advantages, facilities or privileges of such place of public accommodation, . . ."

We believe that the Superior Court dissenters were correct in concluding that "by its practice of opening its dining room to non-members, subject only to the limitation that they be of the Caucasian race and invited by a member, [the lodge] has brought itself within the ambit of a 'public accommodation' as defined by the act." Having done so, it has also brought itself within the prohibition of §5, as above set out, at least to the extent of its dining and bar facilities. Section 4 of the Act,. 43 P.S. §954, defines a place of public accommodation as "any place which is open to, accepts or solicits the patronage of the general public . . . but shall not include any accommodations which are in their nature distinctly private." The lodge concedes that any member of the general public who is of the Caucasian race and who is invited by a member of the lodge is welcome in its dining room. As aptly stated by the Superior Court dissenters: "The interests of privacy and exclusiveness of association which the Act acknowledged by creating its exclusion for fraternal organizations have been compromised by the policies of the organization itself. Any member of the public, regardless of affection or disaffection for the [lodge] and regardless of eligibility for membership (as in the case of women and children) may intrude upon the privacy and exclusiveness of the Moose dining room, so long as there is some member of the Moose who will stand account-

able for his conduct while on the premises . . . that is, any Caucasian member of the public."

The lodge argues that the amendment to § 5 of the act, enacted in 1961, was intended to grant immunity to fraternal organizations. Undoubtedly the act, as hereinabove quoted, does grant to fraternal organizations the right to discriminate on any basis upon which they desire to discriminate, but only when those actions are based on membership. Moreover, that language must be read in the light of the language of §4, which refers to facilities which are "distinctly private". Therefore, fraternal organizations "are immune from the requirement of §5 when the accommodation or activity is related to membership in the organization, *and* when that activity or accommodation is distinctly private as to the members of that organization. There is absolutely no indication that the Legislature intended to grant fraternals a second distinct exception and one going beyond 'membership.' " (Emphasis in original.) *Com. Human Rel. Comm. v. L.O.O.M., supra*, dissenting opinion, at page 361.

There is, of course, no question that when the lodge leases its facilities to nonmembers, a place of public accommodation exists and the lodge does in fact follow a nondiscriminatory policy in such circumstances. The opening of the facilities to guests of members is a difference in degree rather than in character, and each constitutes a step beyond the limited area of immunity granted by the Human Relations Act.

The Superior Court dissenters were correct in resolving the construction of the act in the framework of the Statutory Construction Act of May 28, 1937, P. L. 1019, §52, 46 P.S. §552. The act states, in part: "That the Legislature intends to favor the public interest as against any private interest." No such public interest could be favored by a construction of the legislative intent such as is urged by the lodge.

The Court of Common Pleas of Dauphin County, although it found the actions of the lodge to be "morally indefensible" and the conduct of the lodge's agents to be "deficient in good manners and common sense", fell into error by concluding that the accommodations in question were distinctly private, not a place of public accommodation and, therefore, beyond the reach of the Human Relations Act. The findings and declaration of policy contained in the Human Relations Act, 43 P.S. §952, clearly indicate the legislative intent, and a contrary decision by this Court would fly directly in the face of that stated policy. That is not to say that under the Act the lodge may not discriminate in whatever manner it pleases in determining its qualifications for membership. Having gone beyond that point, however, and made its facilities available to nonmembers, it may not do so on a discriminatory basis in violation of the Human Relations Act.

The orders of the Superior Court and of the Court of Common Pleas of Dauphin County are reversed and the final order of the Human Relations Commission, dated March 3, 1969, is reinstated.

------

CONCURRING OPINION BY MR. CHIEF JUSTICE JONES:

On June 12, 1972, the United States Supreme Court, by a 5-3 vote, in *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 92 S. Ct. 1965, held that the grant by the Commonwealth of Pennsylvania of a liquor license to Moose Lodge 107, located in Harrisburg, did not constitute such state involvement sufficient to implicate the Commonwealth in the Lodge's discriminatory practices so that the Equal Protection Clause of the United States Constitution might be invoked in aid of a Negro guest of a Lodge member who had been denied service, solely by reason of his race, in the Lodge's dining room and bar.

The issue raised upon the appeal now before us is entirely different from the issue determined by the United States Supreme Court: therefore, we are in nowise bound by that Court's determination.[1]

At a hearing, in the case at bar, before the Human Relations Commission of the Commonwealth, the parties stipulated, inter alia:

"4. In conjunction with the operation of its club, [Moose Lodge] operates a dining room and a bar for the sale of liquor or malt and brewed beverages upon its said premises.

. . .

"6. From time to time [Moose Lodge 107] caters meals and banquets upon its said premises for the benefit of organizations other than the Loyal Order of Moose and individuals other than members of Loyal Order of Moose, at which times [Moose Lodge 107] makes its premises available to such organizations and individuals without discrimination because of race or color.

"8. [Moose Lodge 107] permits a member of any lodge of Loyal Order of Moose to bring Caucasian guests upon the premises operated by it, particularly in its dining room and at its bar, but maintains a practice and policy of refusing to permit any such member to bring non-Caucasian guests therein."

The U. S. Supreme Court in *Moose Lodge v. Irvis,* supra, stated: "Moose Lodge is a private club in the ordinary meaning of that term. It is a local chapter of a national fraternal organization having well defined requirements for membership. It conducts all of its

---

[1] As Mr. Justice Douglas accurately wrote in his dissenting opinion, 407 U.S. 179-180, 92 S. Ct. 1975 (footnote) : "There was no occasion to consider the question whether, perhaps because of a role as a center of community activities, Moose Lodge No. 107 was in fact 'private' for equal protection purposes. The decision today, therefore, leaves this question open."

activities in a building that is owned by it. It is not publicly funded. Only members and guests are permitted in any lodge of the order; one may become a guest only by invitation of a member or upon invitation of the house committee." (407 U.S. 171, 92 S. Ct. 1970).[2]

It is my understanding that the appellant-Commission does not contend that, *if Moose Lodge 107 was a purely private club,* it could not limit its membership or guest privileges solely to members of the Caucasian race. On the contrary, it is my understanding that the appellant-Commission contends that, since the Lodge for some years has opened its dining room and bar facilities to public organizations for banquets and for dinners and has made the premises of the Lodge available to the public organizations "without discrimination because of race or color," the Lodge has diminished its status as a purely private club and has become a "place of public accommodation" within the meaning of Section 4(1) of the Human Relations Act (Act of October 27, 1955, P. L. 744, as re-enacted and amended, 43 P.S. §954). With that contention I agree.

By opening its dining room and bar facilities to organizations and non-guest-members, without discrimination, Moose Lodge 107 has become to that extent a center of community activity and, as such, legislatively mandated by Section 5 of the Human Relations Act, supra, not to engage in discriminatory practices. Section 5 of the Human Relations Act, in pertinent part, provides:

"It shall be an unlawful discriminatory practice . . . in the case of a fraternal corporation or association, unless based upon membership in such association or corporation . . .

---

[2] When the U. S. Supreme Court heard and determined *Moose Lodge 107 v. Irvis,* supra, it was unaware of the pendency of the instant appeal before our Court.

"(i) for any person being the owner, lessee, proprietor, manager . . . of any place of public accommodation . . . to

"(1) refuse, withhold from, or deny to any person because of his race, color, . . . either directly or indirectly, any of the accommodations, advantages, facilities or privileges of such place of public accommodation, . . ."

It is my view that Moose Lodge 107, by its own actions, has lost its purely private character and has subjected itself to the legislative mandate of Section 5 of the Human Relations Act. In so holding, we in nowise act in conflict with *Moose Lodge 107 v. Irvis,* supra, but simply decide that Moose Lodge 107 has become a "place of public accommodation" within the purview and scope of the Human Relations Act. Therefore, the action of Moose Lodge 107 in refusing to accommodate K. Leroy Irvis violated Section 5 of the Human Relations Act.