# Collins et al., Appellants, *v.* Main Line Board of Realtors.

Argued January 11, 1972. Before JONES, C .J., EA-GEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

reargument refused August 9, 1973.

*Robert W. Sayre,* with him *David B. Fitzgerald,* and *Saul, Ewing, Remick & Saul,* for appellants.

*Thomas J. Burke,* with him *Haws & Burke,* for appellee.

OPINION BY MR. JUSTICE MANDERINO, May 4, 1973:

Margaret Collins and Suburban Fair Housing, Inc. (Suburban), have taken this appeal from a final decree of the Court of Common Pleas of Montgomery County denying their request for mandatory injunctive relief and damages against the Main Line Board of Realtors. Margaret Collins, the individual appellant, is a vice president of Suburban, the corporate appellant.

In the three years of 1966, 1967 and 1968, Margaret Collins and Suburban Fair Housing, Inc., both real estate brokers licensed by the Commonwealth of Pennsylvania, sought membership in the Main Line Board of Realtors, a Pennsylvania non-profit corporation, which maintains a real estate multiple listing service exclusively for its members. In 1966, Collins' and Suburban's applications for membership were rejected and the reasons for the rejection were discussed with the applicants. In 1967, the applicants were again refused membership, but were given a formal notice and reasons for the denial, all of which dealt with an allegation that Collins and Suburban had "falsely, improperly and unethically" charged the Main Line Board of Realtors and some of its members with improper conduct. The applicants were again denied membership in 1968 but no additional reasons were given to them.

It was subsequent to their third denial of membership that Collins and Suburban brought an action in equity seeking an injunction to restrain the Main Line Board of Realtors from restricting its multiple listing service to members, an injunction against the Board's denial of membership to Collins and Suburban, an injunction against the Board's two-year waiting period for eligibility to participate in the multiple listing service, a mandatory injunction requiring the Board to

accept them as members, and $10,000 compensatory damages in addition to punitive damages. The Chancellor, in his adjudication, dismissed Collins' and Suburban's complaint, concluding that their membership applications had been denied for just cause, that they had no vested property right to membership in the Board, and that nothing in the Board's rules, regulations or by-laws constituted a restraint of trade or a violation of Collins' or Suburban's constitutional rights. Exceptions were taken to the Chancellor's adjudication and dismissed by the court en banc. Thereafter, this appeal was taken.

Appellants contend that the Main Line Board of Realtors is engaging in a restraint of trade which is unreasonable and, therefore, illegal. They contend that the multiple listing service maintained by the appellee corporation unreasonably restricts competition. We agree.

The multiple listing service of the Main Line Board of Realtors operates as a service to its members in the following way. Each member has "exclusive listings"— listings originally brought to the member's office by prospective sellers of real estate. All exclusive listings of all members are then centrally pooled and made available to all other members to sell. The listing member and the selling member of any property share the sales commission.

Approximately 83 firms doing business in three townships of Montgomery and Delaware County are members of the appellee corporation. Sales through their multiple listing service in their first year of operation, 1965, amounted to $49 million. In 1969, the volume reached $75 million.

A real estate broker who is not a member of the appellee corporation cannot list properties for sale on the multiple list and does not receive the multiple listing service available to members showing all of the

properties available for sale by members. A member is also prohibited from listing property on the multiple list if there exists a co-exclusive listing with a nonmember.

A nonmember, who has a property for sale, is thus deprived of the benefits of the multiple listing which brings the property to the attention of member brokers for solicitation of purchasers of said property. The owner of said property, who lists with a nonmember, is thus deprived of the multiple listing benefit.

A nonmember is also deprived of the benefits of having available a list of properties to show to prospective purchasers dealing with a nonmember. Prospective purchasers do not have the benefit of seeing the wide range of properties available and appearing on the multiple list.

A nonmember and clients of a nonmember are restricted from advertising their *products* through the multiple listing service or from receiving significant information about available *products* on the market at any given time. In effect, a nonmember cannot compete in the buying and selling of real estate for clients as effectively as a member of the appellee corporation.

The courts of Pennsylvania have long recognized that agreements in unreasonable restraint of trade are invalid. See *Sun Drug Company v. West Penn Realty Company*, 439 Pa. 452, 268 A. 2d 781 (1970) ; *Schwartz v. Laundry and Linen Supply Drivers' U., Etc.*, 339 Pa. 353, 14 A. 2d 438 (1940) ; *Cleaver v. Lenhart*, 182 Pa. 285, 37 A. 811 (1897) ; and *Nester v. Continental Brewing Company*, 161 Pa. 473, 29 A. 102 (1894).

The United States Supreme Court has examined the problem of membership provisions in voluntary associations which have the effect of unreasonably restraining trade in *Associated Press v. United States*, 326 U.S. 1, 89 L. Ed. 2013 (1945). That case involved a co-operative association of newspaper publishers whose purpose

was to expedite the collection, assembly and distribution of news. The by-laws of the association prohibited all members from selling news to nonmembers and gave members the power to block membership to nonmembers. The government brought a suit against the Associated Press under the Sherman Act (26 Stat. 209, 15 USCA §1) alleging that the association constituted a combination in restraint of trade in news. The *Associated Press* case arose under the applicable federal law —the Sherman Anti-Trust Act. However, the theory of that case and the result is applicable here. This Court has previously recognized that the Sherman Act ". . . is merely the application of the common-law doctrine concerning the restraint of trade to the field of interstate commerce." *Schwartz v. Laundry & Linen Supply Drivers' U., Etc., supra.* In *Associated Press v. United States, supra,* the Court stated: "The Sherman Act was specifically intended to prohibit independent businesses from becoming 'associates' in a common plan which is bound to reduce their competitor's opportunity to buy or sell the things in which the groups compete. Victory of a member of such a combination over its business rivals achieved by such collective means cannot consistently with the Sherman Act or with practical, everyday knowledge be attributed to *individual* 'enterprise and sagacity'; such hampering of business rivals can only be attributed to that which really makes it possible —the collective power of an unlawful combination."

The *Associated Press* case is particularly applicable to the present case. Here the Board consists of "associates"—or members—whose banding together has necessarily and significantly hampered an outsider's opportunities to buy and sell in the Main Line area.

In *Associated Press, supra,* the agreement was held to be an unreasonable restraint of trade—illegal on its face. We think the same can be said of the agreement in this case unless all real estate brokers licensed by

Pennsylvania and in good standing under State law, operating in the area covered by the appellee corporation, are admitted to membership.

An agreement among 83 firms, doing $75 million in multiple listing business, not to do business in a significant manner with other properly licensed individuals in the same area per se restricts competition unreasonably. Economic or business competitors are not permitted to enter such agreements in restraint of trade because they are unreasonable. In *Schwartz v. Laundry & Linen Supply Drivers' U., Etc., supra,* this Court said: ". . . the law will not permit an arrangement, understanding, agreement, or combination among all those in the trade in a given locality, the effect of which is to deprive others of the right to engage in that industry and to deprive the public of the benefits of fair competition therein. No group may enhance its own interests at the expense of the legal rights of others, nor, by acts or agreements violating public policy, interfere with the interests of the public. . . ."

It is not necessary to establish that competition has in fact been restricted by the monopolistic agreement. It is sufficient if the illegal bargain tends to create or has for its purpose to create a monopoly in prices or products. Restatement of Contracts Section 515; See also *Associated Press v. United States, supra,* which said that, ". . . Combinations are no less unlawful because they have not as yet resulted in restraint. An agreement or combination to follow a course of conduct which will necessarily restrain or monopolize a part of trade or commerce may violate the Sherman Act, whether it be 'wholly nascent or abortive on the one hand, or successful on the other.' For these reasons the argument, repeated here in various forms, that AP had not yet achieved a complete monopoly is wholly irrelevant. . . ."

The appellees contend that the members of the appellee corporation are free on an individual basis to collaborate with nonmembers in the sale of real estate. That the appellee corporation may permit such cooperation is totally irrelevant. Possible isolated acts of cooperation between members and nonmembers does not alter the fact that nonmembers are deprived of the use of the multiple listing service in the buying and selling of real estate.

The appellee corporation contends that it can properly establish rules and regulations for membership and can deny membership to a licensed real estate broker according to its own rules and regulations. This cannot be done in a field that has already been preempted by State regulation. Pennsylvania provides for the regulation and licensing of real estate brokers. A Real Estate Commission exists which has the power to refuse, suspend or revoke licenses after complaints have been filed and hearings held. The Commission also has formulated specific enumerated wrongful acts which are the basis for refusing, suspending or revoking a real estate broker's license. *See* Real Estate Brokers License Act of 1929, Act of May 1, 1929, P. L. 1216, §1 et seq., as amended, 63 P.S. 431 et seq.

If the appellee corporation has evidence which would justify suspension or revocation of the appellants' real estate licenses, that evidence should be presented to the Real Estate Commission of Pennsylvania for proper state action. The appellee corporation cannot privately decide that someone should not be a licensed broker. Such judgments are for the proper state agency. Neither the appellee corporation nor the courts should in the first instance usurp the prerogative of the Pennsylvania Real Estate Commission. Until that agency properly acts, a licensed real estate broker is entitled to be treated as an equal with all other licensed brokers in determining membership in the appellee corporation.

The reasons given by the appellee for excluding the appellants from membership should be presented to the Real Estate Commission. If appellants' licenses are suspended or revoked then, and only then, can appellants be barred from participating in a highly valuable economic and competitive tool such as multiple listing.

One of the reasons, for example, given by the appellee corporation for denying membership to the appellants centered around charges brought by appellants on behalf of a client against the appellee, charging it with discrimination before the Pennsylvania State Human Relations Commission. Although the charge was dismissed by the Commission, the Board felt that Collins had maligned its reputation by bringing the charge. We think it sufficient to say that Collins and Suburban should not now be permitted to be penalized for assisting a client in an attempt to assert his constitutional right to petition the government for a redress of grievances. The court below also listed various other reasons which it considered valid enough to justify the rejections. However, none of these reasons were ever given to Collins and Suburban and were, in fact, only superficially mentioned at trial. In any event, they were never the subject of any action against Collins or Suburban by the State Real Estate Commission.

The appellants are entitled to the equitable remedy of injunction to prevent the carrying out of the illegal contract or combination. See *Schwartz, supra.* The record, however, does not provide any legal basis for an award of damages.

The decree of the court below is reversed and the appellees are directed to modify membership regulations so that the appellants and all other persons meeting the requirements of the laws of the Commonwealth of Pennsylvania authorizing such persons to act as real estate brokers qualify for immediate membership and participation in the multiple listing service. In the

alternative, the appellees are directed to modify their regulations so that nonmembers may immediately participate in the multiple listing service on equal terms with members.

Decree of the court below reversed. Costs shall be paid by the appellees.

---

CONCURRING OPINION BY MR. JUSTICE POMEROY:

I agree with the conclusion reached by the majority: the multilisting practice of appellee which operates to exclude a licensed broker from membership is *per se* unlawful under our State's common law as an unreasonable restraint of trade. There is, however, very little State common law on the subject in view of the fact that trade restraints of this nature have been historically of federal concern under the Sherman Act.[1] I think it reasonable and desirable, therefore, to determine what the federal law is on the subject and then to consider whether there are valid reasons for eschewing that law in Pennsylvania. In the case before us, the federal law and our rather meager State law coincide, and I am persuaded that the result is sound. Since this approach to the matter is somewhat different from that of the Court, I elaborate upon it in the balance of this concurring opinion.

The Court's opinion is correct in its observation that the federal courts have in the past held some agreements among participants in an industry which exclude other participants unreasonable *per se*. See, e.g., *Fashion Originators' Guild v. Federal Trade Commission*, 312 U.S. 457, 85 L. Ed. 949 (1941); *Associated Press v. United States*, 326 U.S. 1, 89 L. Ed. 2013

---

[1] Section 1 of the Sherman Act, July 2, 1890, c. 647, §1, 26 Stat. 209, as amended, 15 U.S.C. §1, reads in part: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States . . . is hereby declared to be illegal. . . ."

(1945) ; *Klor's, Inc. v. Broadway-Hale Stores,* 359 U.S.
207, 3 L. Ed. 2d 741 (1959).[2] At the same time, however,
there exist a substantial number of decisions which ap-
proach on a "rule of reason" analysis agreements among
participants which have the effect of creating some asso-
ciations from which other participants are excluded.
See, e.g., *Board of Trade of Chicago v. United States,* 246
U.S. 231, 62 L. Ed. 683 (1918) ; *Silver v. New York Stock
Exchange,* 373 U.S. 341, 10 L. Ed. 2d 389 (1963) ; *Dee-
sen v. Professional Golfer's Association of America,*
358 F. 2d 165 (9th Cir.), cert. denied, 385 U.S. 846
(1966) ; *American Federation of Tobacco Growers v.
Neal,* 183 F. 2d 869 (4th Cir. 1950) ; *Molinas v. Na-
tional Basketball Assoc.,* 190 F. Supp. 241 (S.D.N.Y.
1961). The problem in a case such as that at bar is to
determine which agreements are *per se* unlawful and
which are unlawful only if shown by evidence to work
an unreasonable restraint of trade. One commentator
has suggested what commends itself to me as a sensible
test for resolving the problem: "[E]xclusionary meas-
ures should be permitted when [1] essential for efficient
operation of an entire industry or [2] when justified by
public policy."[3] I will discuss this case in terms of these
two criteria.

(1) *Efficient Operation.* Some industries, by their
nature, require a banding together of industry partici-
pants in order to conduct business. Stock markets
(*Silver,* supra) and commodity exchanges (*Chicago
Board of Trade,* supra) are two examples of industries

---

[2] But cf. P. Areeda, Antitrust Analysis 315 (1967) : "Beware of
the 'per se' label. There are cases where one can weigh harms,
benefits, and alternatives and conclude almost instantaneously that
conduct is unlawful; one decides the particular case so rapidly
that he may express his result in 'per se' language."

[3] Comment, Trade Association Exclusionary Practices: An Af-
firmative Role for the Rule of Reason, 66 Col. L. Rev. 1486, 1487
(1966) [hereinafter referred to as *Columbia Comment*].

which would be altogether eliminated if an agreement among brokers to create a central market was, without more, unlawful. The same is true of professional sport activities (*Deesen,* supra—golf; *Molinas,* supra—basketball). Thus the exclusion by the Professional Golfers' Association, for example, from tournament competition of a player lacking the necessary competitive skill could hardly be said, without more, to violate a law against trade restraint.

In contrast, real estate, unlike stocks and commodities, can be and is sold in individual, face-to-face transactions without the need for a central exchange. As the Chancellor's opinion below states, "[T]he multiple listing service of the Main Line Board of Realtors is not an economic necessity in the buying and selling of real estate." Indeed, the data cited in the Chief Justice's dissenting opinion would indicate that some 58% of the dollar value of real estate business in the Main Line area was transacted without the benefit of multilisting. And while the multiple listing arrangement may tend to promote efficient operation in the sale of real property, no reason is apparent why all qualified brokers in a geographic area should not participate. In short, I do not think that it can be said that the practice of multiple listing of properties for sale by less than all licensed brokers of the area is *"essential* for efficient operation of an entire industry."[4]

(2) *Public Policy.* The commentator cited above, whose test I am here applying, suggests that public policy justifications necessary to prevent application of a *per se* rule may be found in "governmental expres-

---

[4] If the formation of markets or exchanges is essential to the operation of an industry, then such an association may promulgate reasonable rules limiting membership, defining hours of operation, etc. See *Rogers v. Douglas Tobacco Board of Trade,* 244 F. 2d 471 (5th Cir. 1957) ; *Cowen v. New York Stock Exchange,* 371 F. 2d 661 (2d Cir. 1967), aff'g 256 F. Supp. 462 (N.D. N.Y. 1966).

sions of purpose" and in "the need for self-regulation inherent in the industry." Such justification, however, "must reflect a readily identifiable public interest and not merely the wishes of the trade association, for the courts should not serve as arbiters of the desirability of an association's goals."[5] The Real Estate Brokers License Act, May 1, 1929, P. L. 1216, as amended, 63 P.S. §431 et seq., contains a comprehensive scheme for protecting the public against unscrupulous practices of licensed and unlicensed brokers. The Act does not contain any "governmental expressions of purpose" to leave to a trade association the task of enforcing either the standards of the Act or higher standards.[6] For reasons already given, I do not see in the nature of this industry any inherent need for the practice of excluding brokers who are licensed by the State.[7]

---

[5] *Columbia Comment*, supra note 4, at 1499.

[6] But see Securities Exchange Act of 1934, June 6, 1934, c. 404, 84 Stat. 881, 15 U.S.C. §§780-3, 78s, where it is not only provided that brokers adhere to government-established standards of conduct, but is further provided that trade associations (registered exchanges or registered broker-dealer associations) will enforce the standards of the Act as well as other standards.

Compare the unmistakable expression of legislative purpose to permit private parties to maintain trade restraining agreements contained in the "Fair Trade Act", Act of June 5, 1935, P. L. 266, as amended, 73 P.S. §§7-11.

[7] Appellees deny that they refused membership to appellant Margaret Hill Collins for the reason that she represented a client before the Pennsylvania Human Relations Commission in prosecuting a complaint of racial discrimination against appellee Board of Realtors. Although appellee terms that complaint "false and scurrilous", I note that the Commission, although dismissing the complaint, observed that the Commission panel "can understand why the complainant and her representative, Margaret Collins, felt that racial discrimination was practiced against the complainant."

The remaining justification for denying membership is the appellee's statement that "the record amply supports that there were other ethical considerations. . . ." We are not told in plain language the nature of these "other ethical considerations", nor are

The practice of multilisting is undoubtedly a useful economic tool in this industry. A multilisting broker has two business advantages over brokers who are not in a position to render that service: (1) he can offer his clients access to a larger pool of potential buyers than can appellants, and (2) he himself has access to a larger number of potential sellers. It ignores reality to suggest, as does appellee, that the fact that it has not *forbidden* its members to cooperate on an individual transaction basis with nonmember brokers can serve to place nonmember brokers on a par with the virtually automated listings available to members.[8] Were the appellee an association formed to advocate higher standards in the real estate broker profession and did so by distributing information and participating in public debate, I doubt we would find it an unreasonable restraint of trade. But where, in the name of higher business standards, appellee places it competitors (i.e., its nonmember broker competitors) at a palpable economic disadvantage, I think the justification offered "must reflect a readily identifiable public interest." See *American Medical Association v. United States,* 130 F. 2d 233, 248 (D.C. Cir. 1942), aff'd, 317 U.S. 519 (1943).[9] This the record before us fails to do.

_____

we directed to any location in the eight-hundred page record of this case where they might be found.

[8] Austin, Real Estate Boards and Multiple Listing Systems as Restraints of Trade, N.Y.L.J., March 2-5, 1971: "A nonmember broker, qualified under state laws to practice his trade, is unable to attain the same economic benefits as a rival who happens to be a member of the local real estate board and its multiple listing system. It need hardly be noted that this harm to particular classes of market participants results in public harm—a public harm that is magnified by the important relationship of housing to the national well-being."

[9] "[A]ppellants were permitted to organize, to establish standards of professional conduct, to effect agreements for self-discipline and control. There is a very real difference between the use of such disciplines and an effort upon the part of such associations to

The result which the Court has here reached today is, I believe, one which a federal court would have reached under section 1 of the Sherman Act. Although the United States Department of Justice Antitrust Division, has been taking associations of real estate brokers to court with increasing frequency, my investigation indicates that to date all such cases have been terminated by the entry of consent decrees which prohibit, inter alia, the fixing of rates of commission[10] and the exclusion of licensed brokers.[11]

---

DISSENTING OPINION BY MR. CHIEF JUSTICE JONES:
I do not believe the Main Line Board of Realtors or the multiple listing service maintained by that organi-

---

destroy competing professional or business groups or organizations. . . . [A]ppellants have open to them always the safer and more kindly weapons of legitimate persuasion and reasoned argument. . . ."

[10] A trade association of realtors which *fixes commission rates* is *per se* unlawful. *United States v. National Real Estate Boards*, 339 U.S. 485, 489, 94 L. Ed. 1007 (1950). The rules and regulations of appellee's multiple listing service provide: "No listings will be accepted for publication at *less than 6% commission.* . . ."

[11] See *United States v. Greater Pittsburgh Board of Realtors*, Civil Action No. 72-499 (W.D. Pa., consent decree filed April 16, 1973) ("[Defendants] shall upon application made admit to membership any person duly licensed. . . .") ; *United States v. Los Angeles Realty Board*, 1973 Trade Cases, para. 74,366 (C.D. Cal., consent decree filed Feb. 16, 1973) (enjoining commission rate fixing) ; *United States v. Multiple Listing Services*, 1973 Trade Cases para. 74,221 (D. Ore., consent decree filed Dec. 5, 1972) ("The consenting defendant is ordered and directed to admit to membership any person duly licensed as a real estate broker under the laws of the State of Oregon. . . .") ; *United States v. Long Island Board of Realtors, Inc.*, 1973 Trade Cases para. 74,068 (E.D.N.Y., consent decree filed Aug. 1, 1972) ("Accept all licensed brokers") ; *United States v. Memphis Board of Realtors*, 1973 Trade Cases para. 74,056 (W.D. Tenn., consent decree filed July 27, 1972) ("admit to membership any person duly licensed as a real estate broker under the laws of the State of Tennessee").

zation constitutes an unreasonable restraint of trade and, therefore, I dissent.

In concluding that the multiple listing service operated by the Main Line Board of Realtors is a combination in restraint of trade and therefore illegal, the majority has ignored much of the evidence presented to the court below as well as the chancellor's determination based on that evidence. There is no question that the multiple listing service operated in the Main Line area is a useful merchandising tool or that members of the Main Line Board of Realtors benefit substantially from its operation. Nor can it be denied that under certain circumstances members of the multiple listing service may enjoy some competitive advantage over realtors who do not participate in the program.

This Court has the power to strike down any agreement, association or contract which unreasonably restrains trade. However, not every agreement which creates a restraint of trade is unreasonable. As stated by Justice BRANDEIS in *Chicago Board of Trade v. United States,* 246 U.S. 231, 238 (1918): "[T]he legality of an agreement or regulation cannot be determined by so simple a test, as whether it restrains competition. Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence. The true test of legality is whether it is such as may suppress or even destroy competition."

In this case there was a lengthy trial with both sides presenting numerous witnesses and exhibits. The chancellor stated in his initial adjudication: "[T]he multiple listing service of the Main Line Board of Realtors is not an economic necessity in the buying and selling of real estate. There was a great amount of evidence at trial bearing on the percentage of sales obtained from the service and, while the statistics were often in con-

fusion, most brokers who testified stated that the use of the service, while advantageous, was not essential for economic survival as a real estate agent." The chancellor concluded: "In all, the Main Line Board of Realtors is a reasonable banding together of licensed real estate brokers who have a legitimate interest in the qualifications of new members. The association, while having an effect on trade, does not impose an unreasonable restraint thereon. . . ." I believe the chancellor's findings are adequately supported by the record and are in accord with the general principles of law applicable to these facts.[1]

Relying primarily on the decision of the United States Supreme Court in *Associated Press v. United States,* 326 U.S. 1 (1945), and the decision of this Court in *Schwartz v. Laundry & Linen Supply Drivers Union,* 339 Pa. 353, 14 A. 2d 438 (1940), the majority holds that the multiple listing service operated by the Main Line Board of Realtors "per se restricts competition unreasonably." I cannot agree for two reasons: (1) the authorities relied on by the majority are factually distinguishable and (2) the decision that this agreement "per se restricts competition unreasonably" is not supported by the facts presented at the hearing.

There were two primary considerations in *Associated Press v. United States,* which motivated the

---

[1] At issue in this appeal is the question of whether an appellate court, acting under the aegis of eliminating combinations in restraint of trade, can compel a nonprofit corporation to accept members the association has previously deemed unqualified for membership. The general rule applicable to this matter is summarized as follows in Annot., 89 A.L.R. 2d 964, 966 (1963): "Although the Courts will compel reinstatement of a member of an association or society who has been wrongfully or arbitrarily expelled, the general rule is that the courts cannot compel admission of an individual into a voluntary association, since membership is a privilege and not a right, and even if a person's application is arbitrarily refused, he is without legal remedy."

United States Supreme Court to strike down certain by-laws of the Associated Press. Neither of those factors is present in the instant case. First, the Associated Press by-laws absolutely prohibited the sale of news by members of the association to nonmembers. This rule made it impossible for any nonmember to obtain news from an Associated Press member. The by-laws of the Main Line Board of Realtors and the multiple listing service are clearly distinguishable. There is no rule, either written or informal, which prohibits members of the Main Line Board from cooperating with nonmembers in the sale of any parcel of real estate. Indeed, there was testimony presented at the hearing and the chancellor found as a finding of fact that "[m]embers of defendant Board have on numerous occasions participated in and cooperated with plaintiffs in the sales of real estate in the Board's territory."[2]

The second provision of the Associated Press by-laws which the Supreme Court found objectionable concerned the disparate membership requirements demanded of newspapers seeking to join the association. Whereas newspapers which would not be in competition with established Associated Press members could join the association quite easily, it was virtually impossible for a newspaper in competition with an existing member to gain admittance. The effective exclusion of all competitiors denounced in *Associated Press* clearly is not present in this case. At the time of the hearing there

---

[2] The Main Line Board's practice of permitting and even encouraging cooperation with non-member realtors also distinguishes this case from *Grillo v. Board of Realtors of Plainfield Area*, 91 N.J. Superior Ct. 202, 219 A. 2d 635 (1966). Although the *Grillo* decision is not cited by the majority, it was the first decision to apply common-law restraint-of-trade principles to multiple listing services. A key factor in that decision was the by-laws of the service which prohibited all members from dealing with non-members and provided severe penalties for violators.

were eighty-three individual firms who were members of the Board—all selling real estate in the three-township Main Line area. Moreover, the record reveals that the Board was continuing to accept new members who fulfilled the admission requirements set forth in the by-laws.[3] In *Associated Press,* the Supreme Court ruled that the "joint effect" of the exclusive dealing requirement coupled with the systematic exclusion of all competitiors from membership was an unreasonable restraint of trade. Since neither of the factors crucial to the decision in *Associated Press* is present in this action, it is difficult to discern how that case can be regarded as primary or even persuasive authority for the decision reached by the majority.

Similar distinctions can also be drawn between the provisions of the Main Line Board of Realtors' multiple listing service and the contract which was invalidated in *Schwartz v. Laundry & Linen Supply Drivers Union.* The effect of the invalid contract provisions was to prevent the entry of any more independent laundry jobbers into the industry by *prohibiting* all signatories of the contract from dealing with any independent jobbers not under contract at the time the contract was executed. Once again the distinction is obvious: members of the Main Line Board are not only permitted to cooperate with non-members—they are encouraged to do so. The majority is in error when it states that "such cooperation is irrelevant."

---

[3] Frank R. S. Sellers, who was presiding over the Board of Directors of the Main Line Board of Realtors in 1967, testified that in February of 1967 eight applications for membership were presented, including the appellant's application. Six of those applications were approved and two were disapproved. *Cf. Oates v. Eastern County Multiple Listing Service, Inc.,* 113 N.J. Superior Ct. 371, 273 A. 2d 795 (1971), where a multiple listing service which limited its membership to fifty-four original members or their successors was declared in violation of the New Jersey anti-trust law. N.J. S.A., 56:9-1 *et seq.*

I cannot agree with the majority's statement that the multiple listing service at issue in this case "per se restricts competition unreasonably." The lengthy testimony presented at the hearing and the facts as found by the chancellor do not support that conclusion. As noted earlier, not every restraint of trade or every agreement which confers some competitive advantage on its principals is void as a restraint of trade. It is only when the agreement results in an unreasonable restraint that it is subject to judicial interference. I agree with the chancellor that the operation of the Main Line Board's multiple listing service does not unreasonably restrain trade. An analysis of all real estate sales negotiated by members of the Main Line Board from 1965 through 1969 reveals three major categories of sales made during that period: (1) sales of properties by a member broker which were never listed with the multi-list service; (2) direct sales which, although listed on the multi-list service, were sold by the listing broker and did not involve cooperation between brokers; and (3) cooperative multi-list sales where the property was listed by one broker and sold by another member broker. Only the third category, cooperative sales, involved the active operation of the multiple listing service. Between 1965 and 1969 this category of sales never exceeded 42% of the total dollar volume of sales negotiated by members of the Main Line Board of Realtors. In other words, 58% of the sales consummated by member realtors were independent of the multi-list service, involving only the seller, the listing broker and the buyer. On the basis of those figures I believe the chancellor was justified in finding that the multiple listing service, while admittedly benefiting its members, did not constitute an unreasonable restraint of trade.

One other area of the majority opinion requires comment. The majority seems to intimate that private as-

sociations with restrictive membership requirements are impermissible in fields which are regulated and licensed by the Commonwealth. I cannot find any support for that position and strongly disapprove it. The Legislature has created licensing provisions for virtually every occupation which involves some measure of public trust—from auctioneers to weighmasters. The purpose of state licensing is to insure that every person engaged in a regulated activity meets certain *minimum* standards of honesty and competency. There is nothing in this legislatively created scheme of regulation which suggests that individuals engaged in a regulated occupation should be prohibited from banding together in professional associations with an eye toward enhancing the prestige and expertise of their members. Judicial intervention in the membership decisions of private associations is only warranted when association membership is such an essential element of the profession that a nonmember is precluded from practicing his profession, provided that the membership requirements do not violate rights created by statute or by the Constitution. *Commonwealth Human Relations Commission v. Loyal Order of Moose, Lodge No. 107,* 448 Pa. 451, 294 A. 2d 594 (1972). *See Falcone v. Middlesex County Medical Society,* 34 N.J. 582, 170 A. 2d 791 (1961) (compelling admission of Doctor of Osteopathy to County Medical Society where membership in the society was necessary in order to have hospital privileges).

The majority's rule that the Main Line Board of Realtors must accept all realtors who fulfill the state-mandated minimum requirements is predicated on the assumption that membership on the Board is *essential* for all realtors. The record clearly demonstrates that that assumption is erroneous. It can hardly be said that the Main Line Board was "privately deciding that someone should not be a licensed broker" where there

was ample evidence that membership in the Main Line Board and participation in its multiple listing service was found not necessary for economic survival as a realtor in that area.

In holding that the Board must open its membership to all licensed brokers, the majority opinion overlooks the substantial interest the existing members of the Board have in *selecting* those they desire to bind themselves to in a contractual manner. The heart of the multi-list service is its mandatory nature. Any property not sold by the broker who initially lists the property must be referred to the multi-list service for dissemination to all other members. Thereafter, if another member produces a buyer for the property, the original listing broker is required to share his commission with the selling broker. The effect of the majority decision is to force the existing members of the multi-list service into a binding relationship with anyone who meets the minimum qualifications prescribed by the State. Since participation in the multiple listing service is not essential for survival as a realtor on the Main Line and the operation of the service does not constitute an unreasonable restraint of trade, there is no justification for this invasion of private contract rights.

I would affirm the decree of the chancellor.

Mr. Justice ROBERTS and Mr. Justice O'BRIEN join in this dissenting opinion.