Loyal Order of Moose Lodge No. 145, Appellant, *v.* Commonwealth of Pennsylvania, Pennsylvania Human Relations Commission, Appellee.

Argued September 5, 1974, before President Judge BOWMAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT.

*Elmer E. Harter,* for appellant.

*Roy Yaffe,* Assistant General Counsel, with him *Sanford Kahn,* General Counsel, and *Israel Packel,* Attorney General, for appellee.

OPINION BY JUDGE KRAMER, November 22, 1974:

This is an appeal filed by the Loyal Order of Moose Lodge No. 145 (Lodge) from an adjudication of the Pennsylvania Human Relations Commission (Commis-

sion) dated December 5, 1973, in which the Commission found that the Lodge had committed an unlawful discriminatory practice in violation of Section 5(i)(1) of the Pennsylvania Human Relations Act (Act), Act of October 27, 1955, P. L. 744, *as amended,* 43 P.S. §955 (i)(1) (Supp. 1974-1975).

The basic facts in this case are not in dispute. Donald L. Hamilton is a Specialist 6 in the United States Army with more than 13 years military service. He and his wife, Sherry Hamilton, were reared in the Williamsport area of Pennsylvania. Prior to his departure for duty in Korea in 1972, Mr. Hamilton moved his wife, his son and his two daughters from Fort Monmouth, New Jersey to Williamsport. The Hamiltons and their children are of the black race. At the time of the hearings in this case the Hamiltons' son was ten years of age and their two daughters were eight and six years of age. As part of their children's training, the Hamiltons had involved them in organized junior bowling competition. All three of the Hamilton children were duly certified and eligible to bowl in the bantam category under the regulations of the American Junior Bowling Congress (AJBC).

Upon the family's arrival in Williamsport in early November, 1972, the children asked their parents if they could continue to participate in organized bowling. On November 18, 1972, Mrs. Hamilton telephoned the director of bowling at the Williamsport YMCA. The YMCA director advised Mrs. Hamilton that the bantam league at the YMCA could accept her son, but that the YMCA, due to lack of support, did not offer organized bantam bowling for girls. The YMCA director told Mrs. Hamilton, however, that the Lodge sponsored a bantam bowling league, in which girls could participate, at the bowling alley in the Lodge's building. The YMCA director stated for the record that he did not know at the time of the conversation that the Hamiltons were black,

or he would not have recommended the Lodge bowling league to Mrs. Hamilton because he knew the Lodge had restrictions as to race. In any event, on November 18, 1972, after his wife's conversation with the YMCA director, Mr. Hamilton telephoned the Lodge and talked with the Lodge's junior bowling coach. After the coach determined that the Hamiltons' daughters were duly certified by AJBC, she advised Mr. Hamilton that there were openings for additional bowlers at that time and that the Hamiltons' girls would be welcome. Near the conclusion of this telephone conversation, Mr. Hamilton inquired whether the race of his children would have any bearing upon their acceptance into the Lodge's bantam bowling league. At this point, the coach apologetically advised him that his daughters would not be permitted to bowl in the league because the Lodge's rules and policies would not permit their acceptance. At no point during this telephone conversation was Mr. Hamilton told that the Lodge allowed only children and grandchildren of members to bowl in the Lodge's bantam league.

Mr. Hamilton complained to the local chapter of the National Association for the Advancement of Colored People and to the local Human Relations Committee. Both of these organizations attempted to conciliate the matter but were unsuccessful because the officials of the Lodge steadfastly asserted that children of nonmembers were not permitted to participate in the Lodge's bantam bowling league. The record in this case indicates that the Lodge did have an unwritten rule or policy which required participants in the bantam bowling league to be either children or grandchildren of members. The record also indicates, however, that the Hamilton incident triggered some immediate and dramatic changes in the operation of the Lodge's bantam bowling league. Almost immediately the Lodge's junior bowling coach telephoned all of the parents of the some 60 bowlers in the

league and discovered, apparently for the first time, that a considerable number of the participants in the league were neither children nor grandchildren of members.[1] The coach admitted calling the parents of eight of the bowlers and inviting them to become members of the Lodge. Four parents did become members and the children of the remaining four were required to leave the league.

In 1972, Mr. Hamilton could not have become a member of the Lodge because membership in the Loyal Order of Moose was restricted to Caucasians. The race restriction was deleted, however, in May of 1973, by the Supreme Lodge of the Loyal Order of Moose. So that today, the only requirements are that a prospective member be invited by a member, that he be a male twenty-one years of age or older, that he be of good character, that he believe in a Supreme Being and that he be free of any felony convictions. There is also a women's auxiliary, known as the Women of Moose, which is similarly organized and operated.

The record establishes quite clearly that from at least February 1, 1971, the Lodge restricted entrance into its building to members, members' immediate families and members' girlfriends. Apparently the only exceptions to this rule were public banquets and functions, such as Christmas parties for the community and Little League baseball banquets, to which people of all races were admitted. The record also establishes that the personnel who operated the bantam bowling league had failed to enforce for several years the unwritten rule

---

[1] The junior bowling coach testified that eight participants in the bantam league were neither children nor grandchildren of members. The Human Relations Commission representative who investigated the Hamiltons' complaint testified that he had contacted the parents of thirty-four participants in the bantam league and determined that at least fourteen children in the league were neither children nor grandchildren of members.

that participants had to be either children or grand-children of members. Instead the supervisory personnel merely assumed that each parent who presented a child was a member. It was only after the Hamilton incident of November 18, 1972, that strict compliance with the unwritten rule was enforced.

The Commission concluded, under these facts, that the Lodge's bantam bowling league was a "place of public accommodation" as defined by Section 4(1) of the Act, 43 P.S. §954(1) (Supp. 1974-1975) and that the Lodge had committed an unlawful discriminatory practice in violation of Section 5(i)(1) of the Act, 43 P.S. §955(i)(1) (Supp. 1974-1975), by denying the use of its bowling league facilities to the Hamilton children because of their race.

Our scope of review in this case is to determine whether the Commission's adjudication is in accordance with law and whether the findings of fact necessary to support the Commission's adjudication are supported by substantial evidence. *Straw v. Pennsylvania Human Relations Commission*, 10 Pa. Commonwealth Ct. 99, 308 A. 2d 619 (1973).

On appeal to this Court, the Lodge contends (1) that the Commission was in error in holding that the Lodge bowling league in question constituted a place of public accommodation, when the Lodge's unwritten rules restricted its use on the basis of membership; (2) that the Lodge was denied a fair hearing because of the fact that the attorney for the complainants and Commission is the son of the chairman of the Commission; and (3) that the Commission lacks power to award monetary damages.

The definition of "place of public accommodation" in the Act includes the following: "[A]ny place which is open to, accepts or solicits the patronage of the general public, including . . . bowling alleys . . . but shall not include any accommodations which are in their na-

ture distinctly private." Section 4(1) of the Act, 43 P.S. §954(1) (Supp. 1974-1975). Section 5(i)(1) of the Act, 43 P.S. §955(i)(1) (Supp. 1974-1975), reads in pertinent part:

"It shall be an unlawful discriminatory practice . . . in the case of a fraternal corporation or association, *unless based upon membership in such association or corporation* . . .

. . . .

"(i) For any person being the owner, lessee, proprietor, manager, superintendent, agent or employe of *any place of public accommodation,* resort or amusement to

"(1) Refuse, withhold from, or deny to any person because of his race, color, religious creed, ancestry or national origin, or to any person due to use of a guide dog because of the blindness of the user, either directly or indirectly, any of the accommodations, advantages, facilities or privileges of such place of public accommodation, resort or amusement." (Emphasis added.) The record in this case clearly establishes that prior to the Hamilton incident of November 18, 1972, the Lodge's bantam bowling league had been operated for several years without any enforced restrictions based upon membership. This record supports the Commission's conclusions (1) that the Lodge bowling facility constituted a place of public accommodation insofar as the bantam bowling league was concerned, and (2) that the refusal to accept the Hamilton children into the then existing open places in the bantam bowling league was a discriminatory practice based upon race.

The Lodge contends that it was denied a fair hearing because of the relationship of counsel for the Commission (in reality counsel for the complainants) to the chairman of the Commission. We agree with the Lodge's argument that, where an administrative agency acts as an investigator, prosecutor, judge, jury and enforce-

ment officer, we have a duty to scrutinize the record carefully in order to determine that citizens, charged with violating the law, have had all of their due process rights (summarized by the term "fairness") fully protected. Also, we recognize that the recently adopted Code of Professional Responsibility proscribes even the appearance of impropriety by a member of the Bar.[2] The record in this case indicates that the Commissioner in question did not sign the order of the Commission or otherwise participate in the case. Absent proof to the contrary, the burden for which must be carried by those who assert any impropriety, the law presumes that public officials have acted in a proper manner. *See Marino v. Zoning Hearing Board of Harrison Township,* 1 Pa. Commonwealth Ct. 116, 274 A. 2d 221 (1971). We cannot find anything in this record, and the Lodge does not point to anything, which indicates either that anything improper took place or that the Lodge was in any way denied a fair hearing.

The Commission's order of December 5, 1973, contained six paragraphs which ordered the Lodge (1) to extend a written invitation to the Hamiltons' two daughters to enroll and otherwise participate in the bantam bowling league; (2) to cease and desist from any unlawful discriminatory practices regarding its bantam bowling league; (3) to open the bantam bowling league to any and all children without regard to race and without regard to membership affiliation with the Lodge; (4) to submit written reports to the Commission stating the name, race and affiliation to the Lodge of all children in the bantam bowling league; (5) to pay $2,500 to the older Hamilton daughter, through her parents, as compensation for embarrassment, humiliation and mental anguish; and (6) likewise to pay $2,500

---

[2] *See* Canon 9 of the Code of Professional Responsibility and Pa. R. C. P. 205.

compensation to the younger Hamilton daughter. The paragraphs in the Commission's order awarding damages state that they will become effective only if and when the Supreme Court overrules this Court in a series of cases now on appeal. *See St. Andrews Development Co., Inc. v. Pennsylvania Human Relations Commission,* 10 Pa. Commonwealth Ct. 123, 308 A. 2d 623 (1973); *Zamantakis v. Pennsylvania Human Relations Commission,* 10 Pa. Commonwealth Ct. 107, 308 A. 2d 612 (1973); and *Straw, supra.*

We agree with the Lodge's contention that the award of damages by the Commission was improper. The cases cited above all hold that the Commission lacks the power to award monetary damages and those holdings are presently the law in this Commonwealth, even though the cases are on appeal to the Supreme Court. The Commission cannot ignore the law and award damages contingent upon some future action of the Supreme Court.

There is one remaining matter which must be resolved. The intent of the Commission's order seems to be to force the Lodge to continue to operate its bantam bowling league as a place of public accommodation. The Lodge, however, believes that the issue is "moot" because the bantam bowling league has been discontinued allegedly for lack of support. We recognize that the Legislature has given the Commission power to order "such affirmative action . . . as, in the judgment of the Commission, will effectuate the purposes of this act . . . ." *See* Section 9 of the Act, 43 P.S. §959 (Supp. 1974-1975). We must, however, weigh that grant of power against the clear intent of the Legislature to grant fraternal organizations some degree of immunity from the Act. *See* Section 5(i)(2) of the Act, 43 P.S. §955(i)(2) (Supp. 1974-1975). The Supreme Court in *Commonwealth, Human Relations Commission v. Loyal Order of Moose, Lodge No. 107,* 448 Pa. 451, 459, 294

A. 2d 594, 598 (1972), stated that the Act grants fraternal organizations the right to discriminate, but that the discrimination must be based strictly upon membership. We conclude that the Commission cannot order the Lodge to continue to operates its bantam bowling league as a place of public accommodation. On remand, the Commission will be directed to rephrase its order so as to require the extension of a written invitation to the Hamilton children to enroll and otherwise participate in the bantam bowling league conducted at the Lodge and to open such league to any and all children without regard to race or membership in the Loyal Order of the Moose, if the Lodge decides to operate its bantam bowling league as a place of public accommodation, resort or amusement.

In summary then, we hold that the findings and conclusions of the Commission are supported by substantial evidence, and that therefore the Lodge did engage in an unlawful discriminatory practice. We also hold that the Lodge was not denied a fair hearing, that the Commission cannot award contingent compensatory damages, and that the Commission cannot order the Lodge to operate its bantam bowling league as a place of public accommodation. On remand the Commission will redraft paragraphs 1 and 3 so that they become effective only if the Lodge again operates at its facilities a bantam bowling league as a place of public accommodation. Paragraphs 2 and 4 are affirmed. Paragraphs 5 and 6 shall be deleted. Therefore we

## Order

And Now, this 22nd day of November, 1974, based upon the above opinion, it is ordered that this matter shall be remanded to the Commission for the purpose of filing a new order not inconsistent with the above opinion.

CONCURRING OPINION BY JUDGE BLATT:

I cannot agree that the Pennsylvania Human Relations Commission (Commission) lacks the power to award monetary damages. I agree with the result reached by the majority, however, because the Commission has not based its award of damages on any proper standards previously adopted by it. See my concurring opinion in *Zamantakis v. Pennsylvania Human Relations Commission*, 10 Pa. Commonwealth Ct. 107, 308 A. 2d 612 (1973).

DISSENTING OPINION BY JUDGE ROGERS:

I must dissent from two portions of the majority's opinion. The majority's affirmance of paragraph (4) of the Commission's order is contrary to our decision in *Span and Walnut Garden Apartments, Inc. v. Pennsylvania Human Relations Commission*, 15 Pa. Commonwealth Ct. 334, 325 A. 2d 678 (1974). Paragraph (4) requires the appellants "to submit written reports to the Commission stating the name, race and affiliations to the Lodge of all children in the bantam bowling league." In *Span* we wrote: "The requirement of the order that the appellants maintain records which designate the race of an applicant or of a former occupant is in direct violation of Section 5(h)(6) of the Pennsylvania Human Relations Act, 43 P.S. §955(h)(6),...."

I must also dissent, as I have before, from the majority's holding that the Commission has no power to award reasonable damages to victims of discriminatory practices.